**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 6, 2021

**VIA ECF (REDACTED) AND EMAIL**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: *United States v. Ifeanyi Eke*, 19 Cr. 318 (JMF)**

Dear Judge Furman:

The Government respectfully submits this letter in advance of the sentencing of defendant Ifeanyi Eke ("Eke" or the "defendant"), currently scheduled for April 13, 2021, at 11:00 A.M. For the reasons set forth below, the Government respectfully submits that a sentence within the stipulated United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 63 to 78 months' imprisonment is appropriate and necessary to meet the essential sentencing goals of providing just punishment, affording deterrence, and promoting respect for the law.

**A. Background**

On April 30, 2019, a grand jury sitting in this district returned Indictment 19 Cr. 318, charging Eke and co-defendants Cyril Ashu, Joshua Ikejimba, and Chinedu Ironuah with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, substantive wire fraud, in violation of 18 U.S.C. §§ 1343, 2, and, as to Ashu only, aggravated identity theft, in violation of 18 U.S.C. § 1028A. As alleged in the Indictment, the charges in this case stem from a fraudulent business email compromise ("BEC") scheme perpetrated by the defendants and a large network of co-conspirators, many of whom are Nigerian nationals. Ashu, Eke, and Ikejimba were arrested on May 8, 2019. Ironuah remains a fugitive.

As set forth in the Presentence Investigation Report ("PSR"),[1] the defendants worked together to defraud numerous domestic and foreign victims of millions of dollars. (PSR ¶¶ 12–13.) In particular, from 2016 to July of 2018, Eke and his co-conspirators deceived numerous victims into wiring significant sums of money to bank accounts controlled by the defendants and their co-conspirators. The fraud was perpetrated by sending victims "spoofed" emails, which

[1] "PSR" refers to the Final Presentence Investigation Report filed by the U.S. Probation Office on December 14, 2020.

purported to be from counterparties whom the victims knew and trusted, and which contained wiring instructions fraudulently directing the victims to send funds to accounts that were in fact controlled by the defendants and others involved in the scheme. (*Id.* ¶¶ 13–14.) In furtherance of the scheme, the conspirators registered and incorporated shell companies, obtained and used fake passports shipped from Nigeria, and opened fraudulent bank accounts using such information at various banks in the United States. (*Id.*)

Eke played an important role and wide-ranging role in the fraud. During the course of the scheme, Eke personally received wire transfers of fraud proceeds from several different victims into bank accounts that he opened and controlled. One of the victims, an intergovernmental organization headquartered in New York, New York, was defrauded into sending $188,815 into Eke's bank account. After receiving the fraud proceeds from the victims, Eke withdrew and transferred them both for his own use and for dissemination to his co-conspirators. (*See* PSR ¶¶ 15-16.) While Eke used bank accounts in his own name to receive and launder these victim funds, email search warrant evidence shows that co-defendant Chinedu Ironuah ordered from a co-conspirator in Nigeria a fraudulent passport bearing Eke's photograph and a false name (Luthur Mulbah Doley), similar to orders that Ironuah placed for other co-conspirators who participated in the scheme. (*Id.* ¶ 15.)[2]

In addition to receiving and laundering victim funds directly, Eke managed and supervised other members of the conspiracy who participated in the BEC scheme, including by arranging for co-conspirators' accounts to receive fraud proceeds, receiving and communicating wire transfer information contained in victim emails, and coordinating the acquisition and deposit of checks representing fraud proceeds. (*Id.*) Based on search warrants executed on Eke's and his co-conspirators' email accounts, Eke personally received, and forwarded to his co-conspirators, emails from at least two victims containing confirmations of wire transfers that the victims sent in response to spoofed emails that the victims had received. In total, Eke is responsible for actual losses to 35 different victims totaling approximately $2.7 million.

Eke is scheduled to plead guilty pursuant to a plea agreement before this Court on April 13, 2021, immediately prior to sentencing. (ECF No. 154.) According to the plea agreement, the defendant's adjusted offense level is 26 and his criminal history category is I, which results in a Guidelines range of 63 to 78 months' imprisonment. The Probation Office agrees with those calculations (*see* PSR ¶¶ 44, 47), but recommends a sentence of 48 months' imprisonment, to be followed by three years of supervised release. (*See id.* at 20.)

**B. Discussion**

**1. Applicable Law**

As the Court is aware, the Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397

---

[2] The Government notes that the defendant's sentencing memorandum alleges several facts that are not set forth in the PSR relating to how the defendant met Ironuah and became involved in the scheme. (*See* Def. Ltr. at 2, ECF No. 155.) The defendant's version of these events is not fully consistent with the Government's understanding of the facts, and the Government respectfully submits that the Court should not take it into account at sentencing.

F.3d 103 (2d Cir. 2005). A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that range "should be the starting point and the initial benchmark" for the Court's sentencing determination. *Gall v. United States*, 552 U.S. 38, 49 (2007). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *id.* at 46, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, a court then considers the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

**2. A Sentence Within the Stipulated Guidelines Range Is Appropriate**

The Government respectfully submits that a sentence within the stipulated Guidelines range of 63 to 78 months' imprisonment is appropriate and necessary to reflect the serious nature of the defendant's conduct and role in the scheme, to afford specific and general deterrence, and to promote respect for the law.

First, the nature and seriousness of this offense, and the defendant's supervisory role, warrant a Guidelines sentence. This was a serious and pernicious crime: the defendant and his co-conspirators worked together to steal millions of dollars from numerous innocent victims spread across the globe. The scheme was meticulously carried out and concealed for at least two years, which allowed the defendant and his co-conspirators to target more and more victims and line their pockets with more fraud proceeds. The defendant played a critical role in the scheme: he not only received and laundered victim funds directly, but also supervised other co-conspirators who participated in the scheme. Through his role, the defendant was involved in facilitating the theft of approximately $2.7 million from 35 victims as part of the scheme. The Government respectfully

submits that the defendant's active, supervisory role in an extensive scheme that victimized dozens of victims and resulted in the theft of millions of dollars warrants a sentence within the Guidelines range.

In addition, there is a substantial need in this case to promote respect for the law and afford adequate specific and general deterrence. For two years, the defendant participated and supervised others in a wide-ranging fraud scheme of international scope. (PSR ¶¶ 15–16.) He did that despite purportedly working consistently as the owner of "a used car brokerage company" in Georgia during the course of the scheme and in the years leading up to his arrest. (*See id.* ¶ 68.) And he committed those crimes despite having supportive family and friends. (*See id.* ¶¶ 53–57.) Despite their apparent affection and support, the defendant chose to deceive victims, banks, and others to steal millions as part of this conspiracy. Under such circumstances, specific deterrence as to this defendant is an important consideration for sentencing.

General deterrence is also an important sentencing consideration, particularly in the context of lucrative, difficult-to-detect frauds such as this one. BEC schemes have become a pervasive type of financial crime for transnational criminal organizations operating all over the world, targeting victims in the United States and elsewhere in part because these schemes have the potential to generate significant returns for perpetrators.[3] While lucrative for fraudsters, such crimes are painful for victims and the costs resulting from BEC schemes are both substantial and growing. And since BEC schemes often involve the acquisition and exploitation of sensitive private information, they harm victims in a number of ways that may defy ready remediation or compensation. A sentence within the Guidelines range is necessary to warn BEC fraudsters around the world that perpetrating such crimes will be met with serious consequences.

Finally, this was plainly a crime driven by simple greed. It is not a crime that, although not excused, might be explained by circumstances that overwhelmed the defendant's good judgment. While the defendant now claims that he experienced "internal conflict" when he learned the identity of one of the victims, there is no dispute that he continued participating in the scheme, overcome by a "desire for material success." (Def. Ltr. at 2, ECF No. 155.) A sentence within the stipulated Guidelines range is necessary to deter the defendant from committing similar crimes in the future, and to send a strong message to others who might be contemplating engaging in similar lucrative fraud schemes.

---

[3] *See, e.g.*, FBI News, "Business E-Mail Compromise: Cyber-Enabled Financial fraud on the Rise Globally (Feb. 27, 2017), *available at* https://www.fbi.gov/news/stories/business-e-mail-compromise-on-the-rise (last accessed April 5, 2021) ("Since January 2015, there has been a 1,300 percent increase in identified exposed losses, now totaling over $3 billion."); FBI News, "Worldwide Sweep Targets Business Email Compromise," (Sept. 10, 2019) *available at* https://www.fbi.gov/news/stories/operation-rewired-bec-takedown-091019 (last accessed April 5, 2021) ("Since the [FBI's] Internet Crime Complaint Center (IC3) began formally tracking BEC (and its variant, email account compromise, or EAC) in 2013, it has gathered reports of more than $10 billion in losses from U.S. victims alone. The worldwide tally is more than $26 billion.").

### 3. The Defendant's Arguments Do Not Justify a Below-Guidelines Sentence

The Government respectfully submits that the arguments that the defendant advances in his sentencing submission do not justify a below-Guidelines sentence, much less the defendant's requested sentence of 30 months.

First, the defendant argues that he deserves leniency because he is a first-time, non-violent offender. This argument should be rejected. To start, the defendant's criminal history and the nature of his offense are already reflected in the stipulated Guidelines range. Plainly, if Eke were a recidivist violent offender, his Guidelines range would have been much higher. In addition, while this is the defendant's first arrest and conviction, the criminal conduct in this case was ongoing and spanned at least two years. This emphatically is not a case where the offense conduct was aberrant or prompted by a lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life. Rather, the defendant methodically and repeatedly perpetrated and supervised an extensive scheme to defraud numerous innocent victims over a long period of time. Finally, while the defendant attempts to discount the seriousness of economic crimes, such crimes are not abstract: they cause real harm to real victims. Here, the defendant caused harm to nearly three dozen victims, who suffered actual losses totaling $2.7 million as a result of fraud perpetrated by the defendant and others with whom he worked and whom he supervised and managed in the criminal organization. This brazen conduct warrants a Guidelines sentence.

Next, the defendant argues that his requested sentence of 30 months "would be proportionate to that of Mr. Eke's co-conspirators, considering that Ikejimba, who was less involved in the fraud scheme, received a sentence of 24 months' imprisonment." (Def. Ltr. at 6.) The Government respectfully disagrees. Ikejimba was responsible for losses totaling approximately $1.25 million, which is less than half of the losses for which the defendant is responsible. More importantly, Ikejimba was a lower-level participant in the scheme: most of the losses attributed to Ikejimba represented cashier's checks (of victim funds) that Ikejimba received from other co-conspirators, including Eke, and cashed at check cashing facilities. Ikejimba did not have a supervisory or leadership role in the scheme. By contrast, the defendant supervised and managed other co-conspirators who received and laundered victim funds, causing losses to victims totaling approximately $2.7 million. The Government respectfully submits that Eke's supervisory role in the scheme is a significant aggravating factor, which warrants a sentence within the Guidelines range.

Finally, the defendant suggests that he is entitled to a substantial variance based on his [redacted] and his conditions of confinement at the Metropolitan Detention Center ("MDC"), which imposed restrictions in response to the COVID-19 pandemic. Of course, the Court may consider the defendant's [redacted] and conditions of incarceration in its evaluation of the Section 3553(a) factors. The Government respectfully submits, however, that these factors do not warrant a downward variance in this case, much less the defendant's requested 52% variance from the bottom of the Guidelines range. To be sure, the COVID-19 pandemic has created unprecedented challenges, including within Bureau of Prisons ("BOP") facilities. But the measures and restrictions implemented by the MDC and the BOP more generally in response to the pandemic were imposed as part of the BOP's significant effort to prevent the spread of the novel coronavirus for the sake of the safety of the inmate population and the correctional staff, and in accordance with guidance and directives from the Attorney General and relevant health

authorities. Moreover, there is no indication that the defendant was disproportionately affected by any restrictions, or that the BOP has not provided him with adequate care and treatment. [redacted][4] There is no indication that the BOP will not continue to monitor the defendant's physical and mental health and provide him with the necessary care and treatment. The Government respectfully submits that, under these circumstances, neither the COVID-19 pandemic nor the defendant's [redacted] warrants a downward variance from the Guidelines range.[5]

### C. Restitution and Forfeiture

At sentencing, the Government intends to seek a total of $2,691,908.30 in restitution to 35 victims of the scheme, for whose losses the defendant is criminally responsible.[6] In addition, the Government intends to seek forfeiture in the amount of $365,205.00, which represents the total amount of victim funds that the defendant personally received in bank accounts that he controlled as part of the fraud scheme. The defendant used a portion of the victim funds he received to purchase cashier's checks totaling $162,360, which were cashed by co-defendant Ikejimba. Accordingly, the Government requests that the defendant be jointly and severally liable with

---

[4] In this regard, the Government notes that there is no indication in the PSR [redacted], as is alleged in the letters submitted to the Court by the defendant's relatives.

[5] [redacted]

[6] The Government notes that, in the plea agreement, the parties stipulated to the higher restitution amount of $2,791,797.80. The Government is seeking a lower restitution amount because it learned that two of the victims were able to recoup some or all of their losses, and one of the two victims indicated that it does not wish to continue to participate in this action to recoup the remainder of its losses.

Ikejimba for $162,360.00 of the proposed money judgment. The Government will submit proposed restitution and forfeiture orders to the Court in advance of sentencing.

**D. Conclusion**

For the reasons set forth above, the Government respectfully submits that a sentence within the stipulated Guidelines Range of 63 to 78 months' imprisonment would be fair and appropriate in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney
Southern District of New York

By: _____/s/_____
Olga I. Zverovich
Jarrod L. Schaeffer
Assistant United States Attorneys
Tel.: (212) 637-2514 / 2270

cc: Mark I. Cohen, Esq. (via ECF and email)